## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| VICTOR ARVANEH,<br>118 Lupine Drive<br>Stafford, Virginia 22556 )<br><br>  Plaintiff, )<br><br>  v. )<br><br>HCL AMERICA, INC.,<br>330 Potrero Avenue<br>Sunnyvale, California 94085 )<br><br>Serve: CT Corporation System )<br>   818 W Seventh Street, Suite 930 )<br>   Los Angeles, California 90017 )<br><br>  Defendant. )| Case No.: 1:18-cv-1122<br><br>**JURY TRIAL DEMANDED** |

_____

## COMPLAINT

COMES NOW Plaintiff VICTOR ARVANEH, by his undersigned counsel, and complains of Defendant HCL AMERICA, INC., as follows:

## NATURE OF THE CASE

1. Defendant, a global technology firm, pressured Plaintiff to support its fraudulent staffing and billing practices. Specifically, Defendant instructed Plaintiff to move work offshore, in violation of Defendant's contract with a client, and to lie to the client about it. When Plaintiff refused, he was demoted and placed under the supervision of a peer.

2. Furthermore, Plaintiff's supervisors discriminated against him based on his age (YOB: 1961) and national origin (United States) and retaliated against him for complaining of such discrimination. Plaintiff's supervisors (both from the United Kingdom) consistently

pushed Plaintiff to retire and treated younger, non-U.S. workers more favorably than Plaintiff. Plaintiff was put on a performance improvement plan for complaining of discrimination.

3. Shortly before he was fired, Plaintiff discovered that Defendant was violating federal law by using unauthorized alien workers to perform work in violation of their work visas and then fraudulently misrepresenting that fact to its client. Plaintiff complained about this practice to management, Human Resources, and notified the client. Less than two weeks later, Defendant terminated Plaintiff's employment in retaliation for reporting Defendant's illegal practices.

4. Following Plaintiff's termination, Defendant failed to pay Plaintiff his bonuses for work performed prior to his termination.

5. Plaintiff brings this action to recover damages for Defendant's violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; and D.C. law.

## JURISDICTION AND VENUE

6. This Court maintains federal question jurisdiction pursuant to 28 U.S.C. § 1331, Title VII, and the ADEA; diversity jurisdiction pursuant to 28 U.S.C. § 1332; and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7. Venue is proper pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because Defendant formerly employed Plaintiff in the District of Columbia and the unlawful employment actions were committed in this judicial district.

## THE PARTIES

8.  Plaintiff is an individual who resides at 118 Lupine Drive, Stafford, Virginia 22556. Plaintiff was employed by Defendant to work in-house for its client, the American Association of Retired Persons ("AARP"). Plaintiff worked primarily from AARP's D.C. office, located at 650 Massachusetts Avenue N.W., Washington D.C. 20001. During the relevant time period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections, of Title VII, the ADEA, and D.C. law.

9.  Defendant HCL America, Inc. is a global technology firm that assists global business enterprises with technology solutions. Defendant is a for-profit corporation licensed to conduct business in the District of Columbia with its principal place of business located at 330 Potrero Avenue, Sunnyvale, California 94085. During the relevant time period, Defendant was Plaintiff's employer within the meaning, and subject to the requirements, of Title VII, the ADEA, and D.C. law.

## FACTS

### *Plaintiff began working for Defendant in 2015*

10.  On April 1, 2015, Defendant hired Plaintiff as an Integrated Service Delivery Director.

11.  Upon hire, Defendant assigned Plaintiff to work with AARP, a dissatisfied client who had already delivered a 90-day notice of intent to cancel their contract with Defendant.

12.  Plaintiff worked in-house for AARP, primarily at its D.C. office location.

13.  Plaintiff successfully rectified all of AARP's complaints and redeemed the client's confidence within a short time frame.

14.  Due to Plaintiff's exemplary job performance, Defendant promoted Plaintiff to Delivery Unit Head Director in October 2015, with the intention of assigning him additional clients.

15.    In or around October 2016, Plaintiff began reporting to Peter Inness.

16.    In or around June 2017, Inness directed Plaintiff to report to Mark Whitehouse, who held

an equivalent position to Plaintiff.

### *Plaintiff's supervisors discriminated against him based on his national origin and age*

17.    Plaintiff is fifty-six years old (YOB: 1961) and a citizen of the United States.

18.    Upon information and belief, Inness and Whitehouse are from the United Kingdom.

19.    Inness and Whitehouse disfavored Plaintiff because of his age and national origin and

regularly treated younger, non-U.S. employees more favorably.

20.    In or around December 2016, Plaintiff asked Inness to assign him additional clients in

accordance with Plaintiff's position as Delivery Unit Head.

21.    Inness dismissed Plaintiff's role as Delivery Unit Head, told Plaintiff he was not qualified

to assist with additional clients, and said he had no assignments to give to Plaintiff.

22.    Inness nevertheless assigned additional clients and assignments to Plaintiff's peers.

23.    For instance, Inness promoted another Service Delivery Manager to a Delivery Unit Head

and assigned him multiple assignments and clients.

24.    When Whitehouse first met Plaintiff in or around June 2017, Whitehouse said to Plaintiff,

"You're pretty old, when are you going to retire?"

25.    Two weeks before Plaintiff was fired, Mark New (the Account Manager for AARP) told

Plaintiff that he, Inness, and Whitehouse all agreed that Plaintiff must take FMLA leave

and go on a leave of absence due to his age.

26.    New gave Plaintiff a deadline of three days to request FMLA leave and take a leave of

absence due to his age.

27.    Plaintiff did not take FMLA leave. He attended work for approximately one more week

before Defendant terminated his employment.

### *Inness pressured Plaintiff to breach AARP's contract to cut costs*

28. In or around January 2017, Inness told Plaintiff that he must cut costs with AARP by releasing employees or find "any and all other means" to do it.

29. AARP had a Managed Services contract with Defendant, which required a dedicated onsite team. AARP's contract explicitly prohibited the use of a Shared Service model.

30. Inness instructed Plaintiff to offshore employees to India through a Shared Services model, in violation of AARP's contract. Inness further told Plaintiff to reduce his direct reports in support areas such as end users, helpdesk, and infrastructure.

31. Plaintiff explained to Inness that the cost cuts would be impossible without violating AARP's contract.

32. Inness disregarded Plaintiff's valid concerns and directed him to release some of his direct reports, offshore some of the onshore work functions, and shift to a Shared Services model, all without AARP's consent.

33. Inness consistently used Whitehouse as an example of cutting costs without engaging clients, and Inness told Plaintiff to do the same by obtaining AARP's approval without disclosing Defendant's intentions.

34. Plaintiff asked AARP about amending the terms of the contract, which AARP rejected. Plaintiff was therefore required to adhere to AARP's agreed upon contractual terms.

35. Inness was upset by Plaintiff's refusal to breach Defendant's contract with AARP.

36. Inness told Plaintiff he should have falsely told AARP that Defendant would not utilize shared services.

### *Inness favored U.K. employees over Plaintiff*

37. During the same time period, and unbeknownst to Plaintiff, Inness moved two employees from Defendant's Johnson & Johnson account to AARP's account. However, neither employee actually performed work on AARP's contract.

38. Whitehouse managed Johnson & Johnson's account, and the employees' reassignment was intended to benefit Whitehouse's cost reduction efforts.

39. Upon his discovery, Plaintiff reported to Inness the employees should be released from AARP's account because they were not performing work on AARP's contract.

40. Inness reprimanded Plaintiff and refused to release the employees from AARP's account.

41. In preparation for a new project with AARP scheduled to begin on May 1, 2017, Plaintiff found an employee in Defendant's database who was scheduled to be released from the Johnson & Johnson account and met the qualifications needed for the new AARP project.

42. Plaintiff obtained Whitehouse's approval for releasing the employee.

43. However, Whitehouse refused to release the employee on the last day, on or about April 28, 2017, without any prior notice to Plaintiff.

44. Plaintiff complained about the issue to Inness, who told Plaintiff that he had no right to escalate the matter and that Whitehouse could keep the employee.

45. Inness insisted that Plaintiff apologize to Whitehouse.

    Subsequently, Inness told Plaintiff this was a reason for disciplinary action.

### *Inness demoted Plaintiff, put him on a PIP, and assigned Plaintiff to report to his peer*

46. Shortly thereafter, on or about May 27, 2017, Inness demoted the Plaintiff by changing his position title from Director to Operation Lead, without any discussion with Plaintiff.

47. On or about May 27, 2017, Plaintiff emailed Inness regarding the demotion and his intent to file a complaint with HR.

48. Plaintiff also emailed Sundar Rajan (Vice President, Human Resources) and Jagadeshwar Gattu (Vice President, Infrastructure Service Delivery) to file a discrimination complaint against Inness and Whitehouse. Inness was copied on Plaintiff's email to Rajan and Gattu.

49. On or about June 26, 2017, Inness placed Plaintiff on a Performance Improvement Plan ("PIP").

50. Inness informed Plaintiff during his one-on-one meeting that he put Plaintiff on a PIP because of Plaintiff's discrimination complaints.

51. Inness told Plaintiff that he should have never complained to HR and now Inness has to put Plaintiff on a termination path.

52. On or about June 26, 2017, Inness also directed Plaintiff to report to Whitehouse, who was essentially Plaintiff's peer.

53. Plaintiff's first day under Whitehouse's supervision began with a telephone call – during which Whitehouse screamed at Plaintiff for his complaints against Whitehouse, threatened Plaintiff, and told Plaintiff that effective immediately Plaintiff is no longer in charge of anything and his HR access to his staff records and account financial access are revoked.

54. Whitehouse stated to Plaintiff, "I do not appreciate your complaint to HR," referring to Plaintiff's complaint about Whitehouse not releasing the employee for the AARP project.

55. Whitehouse further stated to Plaintiff, "[AARP] is my account now and look what I am going to do with you. You need to go or I will find a way to get you out."

56. Whitehouse directed Plaintiff to reassign his direct reports to Whitehouse.

57. Plaintiff refused and explained that, without proper authorization, Whitehouse's action was

prohibited by Defendant's policies.

58. In response, Whitehouse threatened disciplinary action against Plaintiff.

59. Whitehouse then emailed Plaintiff's staff and set up one-on-one meetings with each, where he directed them to no longer include Plaintiff on emails and to work directly with him.

60. Plaintiff regularly reported Whitehouse's behavior to Inness and HR, but no remedial actions were taken.

61. Inness informed AARP that Whitehouse would replace Plaintiff on the AARP account.

62. AARP instructed Defendant not to replace Plaintiff with Whitehouse.

63. Inness refused and proceeded to replace Plaintiff with Whitehouse without AARP's consent.

64. AARP demanded a formal meeting with Inness's manager (Gattu) and stressed that the account leadership must not be changed per the contract.

65. AARP further expressed dissatisfaction with Defendant's poor performance after Whitehouse took over Plaintiff's role.

66. Defendant authorized Whitehouse to travel to multiple sites for AARP, but in or about August 2017, Defendant denied Plaintiff's request to attend a meeting in Los Angeles requested by AARP.

67. Inness and Whitehouse instructed Plaintiff to make up an excuse to AARP for why he could not go to the meeting in Los Angeles.

68. After AARP formally requested Plaintiff's attendance in Los Angeles, Inness and Whitehouse permitted Plaintiff to attend but said it would be the last time he travelled.

69. Ultimately, AARP cancelled its contract with Defendant.

### *Plaintiff complained about illegal workers*

70. On or about September 20, 2017, approximately two weeks before Plaintiff was fired, Inness told Plaintiff he successfully completed the PIP.

71. The following week, Plaintiff discovered that Ashwani Kumar, Defendant's offshore manager, emailed a request for time approval for billing purposes directly to AARP's Vice President of Security.

72. Kumar emailed the request directly to AARP at Whitehouse's direction.

73. Kumar's email to AARP was contrary to Defendant's policies, which required Plaintiff's consent for time approval requests.

74. AARP rejected the request because the identified employee was not the employee who performed the work.

75. Defendant intentionally did not identify the employee who actually performed the work because that individual possessed only a B1 visa.

76. The B1 visa did not legally authorize the employee to perform the work that Defendant assigned to him on the AARP project.

77. Plaintiff discovered that Defendant had engaged in this illegal and fraudulent staffing and billing practice several times during the AARP project.

78. Instead of obtaining H-1B working visas for employees on the AARP project, Defendant rotated several employees with B1 visas approximately each month.

79. Obtaining a B1 visa (to enter the U.S. for business purposes) is quicker than obtaining an H-1B working visa.

80. This practice also allowed Defendant to pay the B1 visa employees a lower salary consistent with wages in India instead of a salary consistent with U.S. wages for work

performed at AARP's office.

81. Plaintiff immediately emailed AARP, the Offshore Manager, Human Resources, Inness, and Whitehouse reporting the violations of law.

82. In response, Whitehouse told Plaintiff, "I don't give shit how upset the client is or will get. If they don't like the way we work, then don't give us the project."

### *Defendant fired Plaintiff in retaliation for his complaints*

83. On or about October 2, 2017, just one week after he complained about illegal activity by the Defendant, Defendant terminated Plaintiff's employment.

84. The stated reason was for "behavior" – however, this is not credible and merely pretext.

85. The overwhelming evidence and temporal proximity between Plaintiff's complaints and his employment termination demonstrate a retaliatory animus.

86. Furthermore, Plaintiff met his performance objectives and should have received bonuses for doing so.

87. Plaintiff has yet to receive payment for his earned bonuses in the approximate amount of between $6,000 and $7,000.

## COUNT 1

*(Title VII — Hostile Work Environment Based on National Origin)*

88. Plaintiff repeats and realleges the allegations above in paragraphs 1 through 87, as if fully set forth herein.

89. Inness and Whitehouse continually discriminated against Plaintiff based on his national origin (United States).

90. Inness's and Whitehouse's actions unreasonably interfered with Plaintiff's work performance and created an intimidating, hostile, and offensive work environment.

10

91.   Defendant knew about Inness's and Whitehouse's conduct.

92.   By and through their conduct, Defendant violated Title VII.

93.   Defendant acted with malice or reckless indifference to Plaintiff's rights.

94.   As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, pain and suffering, and punitive damages.

## COUNT 2

*(ADEA — Hostile Work Environment Based on Age)*

95.   Plaintiff repeats and realleges the allegations above in paragraphs 1 through 87, as if fully set forth herein.

96.   Inness and Whitehouse continually discriminated against Plaintiff based on his age.

97.   Inness's and Whitehouse's actions unreasonably interfered with Plaintiff's work performance and created an intimidating, hostile, and offensive work environment.

98.   Defendant knew about Inness's and Whitehouse's conduct.

99.   By and through their conduct, Defendant violated the ADEA.

100.   Defendant acted with malice or reckless indifference to Plaintiff's rights.

101.   As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, pain and suffering, and punitive damages.

## COUNT 3

*(Title VII — Retaliation for Protected Activity)*

102.   Plaintiff repeats and realleges the allegations above in paragraphs 1 through 87, as if fully set forth herein.

103.   Title VII prohibits employers from retaliating against an employee for complaining about discrimination.

104.  Inness and Whitehouse retaliated against Plaintiff for complaining about national origin discrimination by demoting him, placing him under the supervision of a peer, putting him on a PIP, removing his authority, and terminating his employment.

105.  Defendant knew that Inness and Whitehouse were retaliating against Plaintiff, and Defendant failed to take any corrective action, thus ratifying the retaliatory conduct.

106.  Defendant's actions were intentional, reckless, and malicious.

107.  As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, pain and suffering, and punitive damages.

## COUNT 4

*(ADEA — Retaliation for Protected Activity)*

108.  Plaintiff repeats and realleges the allegations above in paragraphs 1 through 87, as if fully set forth herein.

109.  The ADEA prohibits employers from retaliating against an employee for complaining about age discrimination.

110.  Inness and Whitehouse retaliated against Plaintiff for complaining about age discrimination by demoting him, placing him under the supervision of a peer, putting him on a PIP, removing his authority, and terminating his employment.

111.  Defendant knew that Inness and Whitehouse were retaliating against Plaintiff, and Defendant failed to take any corrective action, thus ratifying the retaliatory conduct.

112.  Defendant's actions were intentional, reckless, and malicious.

113.  As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, pain and suffering, and punitive damages.

**COUNT 5**

*(Wrongful Termination in Violation of D.C. Public Policy)*

*Carl v. Children's Hospital*, 702 A.2d 159 (D.C. App. 1997)

114. Plaintiff repeats and realleges the allegations above in paragraphs 1 through 87, as if fully set forth herein.

115. 8 U.S.C. § 1324a provides that it is unlawful for a person or entity to knowingly hire an unauthorized alien or to hire an individual without complying with the requirements of subsection (b) therein.

116. 8 U.S.C. § 1324a further provides that it is unlawful to continue to employ the unauthorized alien knowing they are in violation of the statute.

117. Defendant knowingly employed individuals not authorized to perform work in the United States in violation of 8 U.S.C. § 1324a.

118. By complaining about Defendant's attempt to require him to participate in a violation of 8 U.S.C. § 1324a, Plaintiff both reported violations of federal law and refused to engage in unlawful conduct.

119. Defendant terminated Plaintiff's employment because of such disclosures and his refusal to engage in violations of 8 U.S.C. § 1324a.

120. Defendant's actions were intentional, reckless, and malicious.

121. As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, pain and suffering, and punitive damages.

**COUNT 6**

*(Wage Theft – D.C. Code § 32-1303)*

122. Plaintiff repeats and realleges the allegations above in paragraphs 1 through 87, as if fully

13

set forth herein.

123.  D.C. Code § 32-1303 provides that upon employment discharge, the employer must pay the employee's wages earned not later than the working day following discharge, unless the employee was responsible for money belonging to the employer.

124.  Defendants failed to timely pay Plaintiff his bonuses earned for work performed prior to his employment termination.

125.  Defendant's actions were intentional, reckless, and malicious.

126.  As a result, Plaintiff has suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, pain and suffering, and punitive damages.

127.  Defendant is also liable for liquidated damages in the amount of 10 percent of the unpaid wages for each working day during which such failure continued, or an amount equal to treble the unpaid wages, whichever is smaller.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all counts contained in the Complaint.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant on all Counts, and award Plaintiff damages in in the amount of $1,000,000, or in such other amount as is determined at trial, consisting of lost wages and benefits, compensatory damages for pain and suffering, emotional distress, punitive damages, an amount equal to the tax on any award, pre- and post-judgment interest, costs, attorney's fees, and any such other relief as is just and proper.

Date:   May 10, 2018                    RESPECTFULLY SUBMITTED,

                                        ALAN LESCHT & ASSOCIATES, P.C.

                                        By: /s/   Erin McNamara
                                        Rani Rolston [DC Bar #974052]
                                        Matthew Estes [DC Bar #989814]
                                        Erin McNamara [DC Bar #1049087]
                                        ALAN LESCHT & ASSOCIATES, P.C.
                                        1825 K Street, N.W., Suite 750
                                        Washington, D.C. 20006
                                        Tel:  (202) 463-6036
                                        Fax:  (202) 463-6067
                                        rani.rolston@leschtlaw.com
                                        matthew.estes@leschtlaw.com
                                        erin.mcnamara@leschtlaw.com
                                        *Attorneys for Plaintiff*